UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HARLEY MARINE SERVICES, INC., a
Washington corporation; OLYMPIC
TUG & BARGE, INC., a Washington
corporation,

               Plaintiffs,

      v.

FATHOM MARINE, INC., a British Columbia
corporation,

               Defendant.

IN ADMIRALTY

NO.  2:17-CV-856

COMPLAINT FOR MONEY
DAMAGES AND INJUNCTIVE
RELIEF

Plaintiffs state and alleges as follows:

## I.  PARTIES, JURISDICTION, AND VENUE

1.1     This is an action within the admiralty and maritime jurisdiction of this Court

pursuant to 28 U.S.C. §1333 and Federal Rule of Civil Procedure 9(h).

1.2     Plaintiff Olympic Tug & Barge, Inc. ("Olympic") was, and still is, a corporation

organized and existing under the laws of the State of Washington with its principal place of

business in Seattle, Washington.

1.3     Plaintiff Harley Marine Services, Inc. ("HMS") was and still is a corporation

organized and existing under the laws of the State of Washington with its principal place of

business in Seattle, Washington.

COMPLAINT FOR MONEY DAMAGES
AND INJUNCTIVE RELIEF - 1

1.4     HMS is the parent company of Olympic, which is a wholly owned subsidiary.  As explained more fully below, at various times relevant to this lawsuit, HMS acted as agent of Olympic and participated in, facilitated, and coordinated the requisition of emergency services on Olympic's behalf.  As agent, HMS incurred costs and expenses on behalf of Olympic as a result of Fathom's conduct.

1.5     Upon information and belief, defendant Fathom Marine, Inc. ("Fathom") was, and still is, a corporation formed in Canada and existing under the laws of that country and those of the Province of British Columbia.  Its principal place of business is located in North Vancouver, British Columbia, Canada.

1.6     Jurisdiction and Venue are proper under the governing bareboat charter's dispute resolution clauses, with the parties agreeing to submit to the exclusive jurisdiction of the courts located in Seattle, Washington.

## II.  FACTS

2.1     The INVESTIGATOR is a 214-foot-long, double-hulled, tank barge.  When not on charter to another company, Olympic is the barge's owner *pro hac vice*.

2.2     The INVESTIGATOR is capable of, and at times pertinent to this lawsuit was, transporting petroleum products.

2.3     The INVESTIGATOR is a "dumb" barge, having neither independent propulsion nor crew.

2.4     On or about July 3, 2016, Fathom entered into a standard "BIMCO" bareboat charter with Olympic for the use of the INVESTIGATOR (hereinafter "the Charter"), a true and correct copy of the Charter, with proprietary figures redacted, is attached hereto as "Exhibit A."

2.5     The Charter lists Olympic as the owner of the INVESTIGATOR.  The Charter identifies Fathom as the barge's bareboat charterer for purposes of the Charter.  The Charter contained, *inter alia*, the following material terms:

COMPLAINT FOR MONEY DAMAGES
AND INJUNCTIVE RELIEF - 2

ATTORNEYS AT LAW
**BAUER MOYNIHAN & JOHNSON LLP**
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON  98121-2320
(206) 443-3400

a.   "**2.    Charter Period**… The Charter Period shall commen[c]e on the date indicated in Box 14 [July 5, 2016]… and continue until the Vessel has been redelivered to the Owners [Olympic] as required by this Charter."

b.   "5.    Operation and Use  Charterers [Fathom] shall, at their sole expense, man fuel, victual, navigate, operate, maintain and supply the Vessel, and pay all charges and expenses of every kind and nature whatsoever relating to the Vessel, its use and/or operation during the Charter Period."

c.   "**10.    Maintenance and Operation**… The Charterers shall maintain the Vessel… in a good state of repair, in efficient operating condition as it was upon delivery and otherwise in accordance with good U.S. commercial maintenance practice… The Charterer[']s responsibility for maintenance shall include all cost and expenses relating to Coast Guard, American Bureau of Shipping (if applicable)… The Charterers agree to take such measures as are reasonably necessary and appropriate to prevent exposure of component parts of the Vessel including bottom and other painting..."

d.   **11.    Hire**  (a)    The Charterers shall pay hire due to the Owners punctually in accordance with the terms of this Charter in respect of which time shall be of the essence.    (b)    The Charterers shall pay to the Owners for the hire of the Vessel a lump sum in the amount indicated in Box 22… Hire shall be paid continuously throughout the Charter Period…    (f)    Any delay in payment of hire shall entitle the Owners to interest at the rate per annum as agreed in Box 24.  If Box 24 has not been filled in, the three months Interbank offered rate in London (LIBOR or its successor) for the currency stated in Box 25, as quoted by the British Bankers' Association (BBA) on the date when the hire fell due, increased by 2 percent, shall apply.    (g)    Payment of Interest due under sub-clause 11(f) shall be made within seven (7) running days of the date of the Owners' invoice specifying the amount payable or, in the absence of an invoice, at the time of the next hire payment date."

COMPLAINT FOR MONEY DAMAGES
AND INJUNCTIVE RELIEF - 3

1      e.      "**13.    Insurance and Repairs**      (a)      During the Charter Period the

2   Vessel shall be kept insured by the Charterers at their expense against hull and machinery, war

3   and Protection and Indemnity risks (and any risks against which it is compulsory to insure for the

4   operation of the Vessel…)…   The Charterers also to remain responsible for and to effect repairs

5   and settlement of costs and expenses incurred thereby in respect of all other repairs not covered

6   by the insurances and/or not exceeding any possible franchise(s) or deductibles provided for in

7   the insurances…      (g)      The Charterers shall indemnify and hold the Owners harmless

8   (including legal fees and costs of litigation) of and from any loss, damage, expense, liability,

9   claim, or suit resulting from the failure to procure and/or maintain any insurance as required by

10   this Contract and/or the failure of any such insurance, including exposure to any loss, damage,

11   expense, liability, claim or suit which would have been covered had the insurance been procured

12   and maintained as required."

13      f.      "**15.    Redelivery**      At the expiration of the Charter Period the Vessel

14   shall be redelivered by the Charterers to the Owners at a safe and ice-free port or place as

15   indicated in Box 16 [Vancouver, British Columbia, Canada], in such ready safe berth as the

16   Owners may direct… should the Charterers fail to redeliver the Vessel within the Charter Period,

17   the Charterers shall pay the daily equivalent to the rate of hire stated in Box 22 plus 10 percent, or

18   to the market rate, whichever is the higher, for the number of days by which the Charter Period is

19   exceeded.  All other terms, conditions and provisions of this Charter shall continue to apply…

20   The Charterers shall be [ ] obligated to redeliver the Vessel in the same good condition, repair and

21   working order as upon delivery… with such same good condition, repair a[nd] working order as

22   upon delivery defined to exclude ordinary wear and tear occurring to the Vessel during the

23   Charter Period… Redelivery shall not occur until the Vessel has been restored to the same good

24   condition, repair, and working order, less ordinary wear and tear, as upon delivery has been

25   accomplished…"

26

COMPLAINT FOR MONEY DAMAGES
AND INJUNCTIVE RELIEF - 4

g.   "**17.   Indemnity**   (a)   The Charterers shall indemnify the Owners against any loss, damage or expense incurred by the Owners arising out of or in relation to the operation of the Vessel by the Charterers, and against any lien of whatsoever nature arising out of an event occurring during the Charter Period."

h.   "**30.   BIMCO Dispute Resolution Clause… Dispute Resolution**… (b) This Contract shall be governed by and construed in accordance with the General Maritime Law of the United States, or by the laws of the State of Washington in the event there is no General Maritime rule of law applicable, and any dispute arising out of or in connection with this Contract shall be resolved through litigation in the federal or state courts located in Seattle, Washington with the parties consenting to [its] personal jurisdiction and with the substantially prevailing party to recover its legal fees and costs of litigation."

2.6    Olympic delivered the INVESTIGATOR at the outset of the Charter, as agreed.

2.7    Operating under the Charter, in early September 2016, Fathom towed the INVESTIGATOR with its tug, FATHOM WAVE, from Vancouver, British Columbia to Tuktoyaktuk, located in Canada's Northern Territories.

2.8    Tuktoyaktuk is an Inuvialuit hamlet within the Inuvialuit Settlement Region in Canada.  Tuktoyaktuk, and the entire Inuvialuit Settlement Region, borders the Beaufort Sea, a marginal sea of the Arctic Ocean.

2.9    On or about September 2, 2016, Fathom grounded the INVESTIGATOR on a sand bar just east of Pullen Island, approximately 40 miles northwest of Tuktoyaktuk.

2.10    The crew of the FATHOM WAVE disconnected the tug from the INVESTIGATOR, allowing it to drift in a southeastern direction.

2.11    The INVESTIGATOR drifted approximately 37 miles, grounding again at Toker Point, approximately 14 miles north-northeast of Tuktoyaktuk.  The crew of the FATHOM WAVE failed to reconnect to the barge at any point along its approximate 37-mile drift through the Beaufort Sea.

COMPLAINT FOR MONEY DAMAGES
AND INJUNCTIVE RELIEF - 5

2.12    Surrounding Toker Point are at least two Inuvialuit burial sites, as well as Inuvialuit hunting, fishing, and trapping areas, as well as Inuvialuit historical and cultural sites.

2.13    The area surrounding Toker Point is also a sensitive waterfowl habitat.

2.14    The grounding of the INVESTIGATOR—a tank barge loaded with petroleum product—by Fathom posed a serious, immediate threat to both the pristine natural conditions of Toker Point, the Inuvialuit Settlement Region, and the cultural landmarks of the Inuvialuit people.

2.15    Fathom's attorneys remarked subsequently, in Fathom's application for an immediate Coastwise Trading License, that "[t]he circumstances surrounding the grounding of the Investigator and the heavy weather conditions in the region which has hampered refloating operations, as well as the impending close of the arctic season, has created a situation of urgency in which the normal delays of notification cannot be respected[.]"

2.16    Despite the immediacy of the danger posed by Fathom's grounding of the INVESTIGATOR, upon current information and belief, no notice of the event or grounding was given to Olympic or HMS until the following day, September 3, 2016.

2.17    Fathom informed Olympic/HMS on September 3 that while weather hampered initial retrieval efforts, the INVESTIGATOR should be recovered in short order and safely moored in Tuktoyaktuk harbor, likely by the evening of September 6.

2.18    The INVESTIGATOR was not in Tuktoyaktuk harbor that evening; nor the next evening; nor the next.

2.19    In its September 8, 2016 "Preliminary Salvage Plan"—developed by Fathom and its surveyor, Marc McAllister, and sent to the Canadian Coast Guard ("CCG")—Fathom represented that the INVESTIGATOR was filled with 20 metric tons of diesel in its #4 port and starboard tanks.  Twenty metric tons is approximately 6,265 gallons of diesel.

2.20    Fathom's sole "plan" as set forth in its Preliminary Salvage Plan involved using the "prop wash" (Stage 1 of Fathom's plan) from a towing vessel to remove sand and sediment surrounding the INVESTIGATOR.

COMPLAINT FOR MONEY DAMAGES
AND INJUNCTIVE RELIEF - 6

2.21    An attorney for Fathom's insurance company later confirmed in writing that Fathom's "prop wash" solution was entirely infeasible, as it was dependent on unavailable Canadian vessels.  (Surveyor McAllister later proposed a second option of using a truckable suction dredge to remove sand from beneath the barge—also confirmed by counsel as infeasible due to the unavailability of the suction dredge.)

2.22    No plan was formulated by Fathom beyond the infeasible "prop wash" solution to free and recover the barge.

2.23    "Stage 2" of Fathom's "plan" was merely that Fathom would draft a "Stage 2" plan if Stage 1 ("prop wash") failed.

2.24    "Stage 3" of Fathom's "plan" was strikingly brazen: "winter-in" the INVESTIGATOR—that is, leave it where it was to be consumed by ice from the Canadian Arctic and risk environmental cataclysm.

2.25    Fathom revised its initial Salvage Plan on September 9, 2016.  In its September 9, 2016 "Revision 1" to its Salvage Plan, Fathom acknowledged that "[a]ll non-ice strengthened vessels are to be clear [of] the zone by October 20th."  (Fathom again represented in "Revision 1" of their Salvage Plan that the barge was filled with 20 metric tons or 6,265 gallons of diesel fuel.)

2.26    In sum, Fathom had no meaningful plan to recover the INVESTIGATOR, and was aware that the window for recovery of the barge was closing quickly.  According to Fathom, by October 20, arctic ice would make the area where Fathom had grounded the INVESTIGATOR inaccessible to all but "ice-classed" vessels.

2.27    Ice, which moves throughout the Canadian Arctic, posed an ongoing threat of which Fathom was expressly aware.  Ice could shift the barge to an unknown location, dislodge it, set it adrift, or, worse, crush or puncture the vessel, spilling its payload of petroleum products into the surrounding pristine environment.

2.28    Despite the immediate risk posed by the grounding of the INVESTIGATOR, and despite the risk posed by the imminent freezing of the area, Fathom's September 9 "Revision 1"

COMPLAINT FOR MONEY DAMAGES
AND INJUNCTIVE RELIEF - 7

to its Salvage Plan prioritized "lightering" (i.e. removal of petroleum products from the barge) and "winterizing" the INVESTIGATOR to leave it where it was over removal.

2.29    In its "Decision Making Timeline," Fathom provided for only two days of "prop washing" sand (September 14 and 15) before its focus shifted to "winterizing" the INVESTIGATOR.

2.30    As Fathom was aware, "lightering" the INVESTIGATOR for winter would not remove all of the petroleum product, as even when "empty," the barge's tanks will remain coated with substantial quantities of petroleum product, still capable of diffusing into the surrounding environment.

2.31    Despite the alleged commitment to lighter the barge, the only lightering plan Fathom ever proposed that was capable of implementation was the fanciful suggestion to use a helicopter to collect the barge's fuel in totes and fly it off the barge.

2.32    As part of its lightering plan, Fathom failed to make preparations for basic safety precautions, such as gas freeing the INVESTIGATOR's tanks.  Furthermore, Fathom had misrepresented the quantity of diesel onboard the INVESTIGATOR.  The barge was carrying closer to 13,894 gallons of diesel, as opposed to the 6,265 gallons initially reported.

2.33    Moreover, Fathom also represented to the CCG in its "Revision 1" to its Salvage Plan that "there is very little surplus of equipment available" to partake in actually removing the INVESTIGATOR (as opposed to "winterizing" it) from its current position.

2.34    Communications from Fathom to Olympic with regard to the INVESTIGATOR'S status between September 6 and the following week and a half were, effectively, non-existent.

2.35    Instead, while the INVESTIGATOR was stranded at Toker Point, Fathom focused its communications with Olympic and HMS on proposals for purchasing the INVESTIGATOR.

2.36    Through Olympic and HMS' customers and other various channels, on or about September 16, Olympic and HMS learned that the INVESTIGATOR was still grounded and little, if any efforts, had been expended by Fathom to recover the barge.

COMPLAINT FOR MONEY DAMAGES
AND INJUNCTIVE RELIEF - 8

2.37    Olympic, HMS, and the Harley family of companies pride themselves on their commitment to safety, community, and environmental responsibility.  Having the INVESTIGATOR, an Olympic barge, with Olympic colors, carrying petroleum product grounded in the Inuvialuit Settlement Region, in a pristine wildlife habitat—and, to learn of its continued grounding from its customers, rather than Fathom—was simply not acceptable.

2.38    It was not until September 16 that Olympic/HMS was provided Fathom's "Revision 1" Salvage Plan.

2.39    Upon learning the INVESTIGATOR was still grounded, Olympic/HMS immediately mobilized personnel to attend the barge and assess the ongoing situation.

2.40    Despite knowing its plan was entirely infeasible, Fathom reassured Olympic and HMS on September 19 that Fathom's prop-washing plan was likely to free the barge in the next few days.  Fathom also reassured Olympic and HMS that Fathom would complete lightering operations by October 2.

2.41    With no progress made by Fathom in freeing the INVESTIGATOR, Olympic and HMS personnel reached out to Fathom and Olympic's joint insurance underwriters, indicating Olympic/HMS' frustrations with the non-progress of the recovery of the INVESTIGATOR.

2.42    Olympic and HMS personnel were rebuffed, with the hull underwriters indicating they would not communicate with Olympic—their own insured—due to concerns over "confidentiality."

2.43    Frustrated by Fathom's non-action and the bad faith behavior of its insurers, on September 26, Olympic and HMS demanded SMIT—an experienced salvage and vessel-recovery company—be named as salvage master to ensure immediate recovery of the INVESTIGATOR.

2.44    Fathom's underwriters refused, and Fathom did not press its insurers.  Ultimately, SMIT was not permitted to participate in the recovery effort.

2.45    Olympic and HMS repeated concerns about the consequences of "a failed salvage" of the INVESTIGATOR to Fathom and its underwriters on multiple occasions.

COMPLAINT FOR MONEY DAMAGES
AND INJUNCTIVE RELIEF - 9

ATTORNEYS AT LAW
**BAUER MOYNIHAN & JOHNSON LLP**
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON  98121-2320
(206) 443-3400

2.46    Olympic and HMS expressed, in no uncertain terms, to Fathom and its underwriters, that Olympic/HMS suspected they were colluding to simply leave the INVESTIGATOR grounded on the beach.

2.47    Olympic and HMS advanced their own plan to both Fathom and its underwriters to use airbags and available equipment to refloat the INVESTIGATOR while pulling it off the beach.  Olympic and HMS' plan was time-tested and had been used previously in the Arctic to refloat barges.

2.48    Contrary to Fathom's representations that there was no meaningful available equipment to participate in recovering the INVESTIGATOR, Olympic and HMS immediately located recovery assets, including marine equipment operated by Bowhead Transport, Cruz Marine, Crowley, and others to participate in the recovery effort.

2.49    Among this equipment was the Bowhead-operated, triple-screw, shallow-water vessel UNALAQ, various tugboats (including HMS' own equipment), 100-ton winches which could be mounted on a variety of vessels to participate in pulling the INVESTIGATOR off the beach, as well as airbags which could be placed under the barge to reduce sand suction and aid in the recovery effort.

2.50    Olympic and HMS' plan to minimize any losses to the barge and surrounding environment was not only the "right thing to do" for the surrounding community and environment, it was also fully consistent with its duty to sue and labor under its insurance policies to reduce potential losses to its underwriters.

2.51    On September 29, 2016, Olympic/HMS expressly advised Fathom, in writing, that its salvage attempts to date had been an utter failure, time was being wasted, and its fanciful plan for helicopter lighterage was both foolhardy and dangerous.

2.52    Fathom knew that the highest tide in the area was set for October 2, 2016.  After that time, decreasing water levels would necessarily make it more difficult to refloat and recover the INVESTIGATOR.

COMPLAINT FOR MONEY DAMAGES
AND INJUNCTIVE RELIEF - 10

ATTORNEYS AT LAW
**BAUER MOYNIHAN & JOHNSON LLP**
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON  98121-2320
(206) 443-3400

2.53     On October 1, 2016, Olympic/HMS again expressly requested involvement in recovery of the barge.  They also expressly requested immediate funding from Olympic and Fathom's mutual underwriters so Olympic/HMS could mobilize equipment.  These requests were denied.

2.54     From late September, until October 6, 2016, Fathom repeatedly insisted to Transportation Canada and the CCG that Fathom's focus should be helicopter lightering of the barge and winterizing same, rather than refloating and recovery of the barge.

2.55     On September 30, 2016, Fathom went so far as to misrepresent in writing to Transportation Canada and the CCG that Olympic and HMS had made no specific offer of assistance to Fathom.  (Fathom subsequently insisted that both agencies cut off all communication with Olympic and HMS.)

2.56     Fathom's ineptness and conceit resulted in Olympic/HMS being unable to mobilize in time to utilize the season's highest tides on October 2 to refloat and recover the INVESTIGATOR.

2.57     As expected, and as Olympic/HMS expressly warned, Fathom's attempt to lighter the INVESTIGATOR with helicopters was an utter failure.  On or about October 6, upon information and belief, Fathom was able to remove approximately one small "tote" worth of petroleum product before Fathom's helicopter was forced to retire.  At no time was Fathom able to remove any meaningful quantity of diesel from the INVESTIGATOR with its helicopter lightering program.

2.58     Following the failed helicopter lightering, CCG issued a Direction Order on October 6, 2016, more than 30 days after the casualty first occurred.  The Direction Order stated as follows: "FATHOM Marine shall undertake refloating operation of the barge INVESTIGATOR.  HARLEY MARINE SERVICES shall assist FATHOM MARINE in its attempt to refloat the barge INVESTIGATOR."

ATTORNEYS AT LAW
**BAUER MOYNIHAN & JOHNSON LLP**
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON  98121-2320
(206) 443-3400

2.59    With a clear directive from the Canadian government, Olympic and HMS immediately mobilized all available resources to attempt to recover the INVESTIGATOR.

2.60    Despite this, Fathom continued to interfere with recovery of the barge.

2.61    Upon information and belief, Fathom would not mobilize available heavy equipment to participate in the refloating of the INVESTIGATOR, while it simultaneously interfered with Olympic and HMS renting the equipment directly.

2.62    Fathom refused to confirm even the availability of heavy equipment at its disposal that could be used to assist Olympic and HMS to refloat and recover the INVESTIGATOR.

2.63    Due to Fathom's delays, work on refloating the barge with airbags did not begin in earnest until October 10, when Fathom finally delivered to Olympic and HMS the first airbag to refloat the barge.

2.64    Despite Fathom's behavior, five airbags were eventually placed under the barge, and progress was made towards refloating it.

2.65    However, on October 16, 2016, the CCG terminated all recovery operations due to increasing ice and hazardous weather.  As predicted, seasonal ice had arrived in the area, making continued operations too hazardous to continue.  The cessation of work due to the arrival of seasonal ice was the precise thing Olympic and HMS had warned of since mid-September.

2.66    Olympic and HMS could have fully refloated the barge with an additional 48 hours of time to work.

2.67    The INVESTIGATOR remains grounded in the Canadian Arctic.

2.68    Fathom's ineptness, conceit, and obstruction, above described, were the direct causes of Olympic and HMS' inability to refloat and recover the INVESTIGATOR.

2.69    It was later discovered that Fathom entered into an undisclosed agreement with it and Olympic's mutual insurers which favored Fathom's financial assets over those of Olympic and HMS.  Fathom has received over $500,000 in improper payments, while Olympic and HMS received nothing.

ATTORNEYS AT LAW
**BAUER MOYNIHAN & JOHNSON LLP**
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON  98121-2320
(206) 443-3400

2.70    Simultaneously, Fathom and its underwriters denied information to Olympic. Indeed, until March of this year—when Olympic's underwriters sued Olympic in Canada— Olympic and Fathom's joint underwriters refused even to provide Olympic with a copy of the insurance policies on which Olympic was a named insured.

2.71    Fathom's actions held the INVESTIGATOR hostage while threatening petroleum discharge into Inuvialuit territory, onto culturally significant locations, and into the surrounding pristine environment.  Fathom's actions were performed for the apparent purpose of permitting Fathom to reap the benefits of its inept "recovery efforts" while simultaneously using the INVESTIGATOR's precarious position and threat to the environment to negotiate a better purchase price from Olympic and HMS.

2.72    Approximately two weeks after the CCG discontinued recovery operations, Fathom contacted Olympic wishing to discuss "completing" the purchase of the INVESTIGATOR, despite Olympic's September 29, 2016 writing in which it rescinded all offers of sale.

2.73    Fathom's behavior in grounding the barge, failing to recover it, withholding information, preventing Olympic from refloating and recovering the barge, while threatening the local stakeholders and the natural environment with a petroleum spill was reckless, willful, and wanton.

2.74    Total costs associated with Olympic/HMS' efforts to refloat and recover the INVESTIGATOR are in excess of $4,300,000, and include costs of personnel and chartering of equipment used in the recovery effort.

2.75    Olympic's joint insurance carriers have failed, at present, to pay any of Olympic/HMS' costs associated with recovering the INVESTIGATOR.

2.76    Fathom has ceased paying charter hire to Olympic despite the barge never having been redelivered to Olympic under the terms of the governing Charter.  Hire continues to accrue. Currently owed hire is in excess of $300,000.

COMPLAINT FOR MONEY DAMAGES
AND INJUNCTIVE RELIEF - 13

2.77     At the earliest opportunity, Olympic and HMS anticipate being forced to undertake additional efforts to recover the INVESTIGATOR from its current location.  Additional efforts will result in additional costs associated with recovery.

2.78     Assuming the barge can be recovered, additional costs will have to be expended to survey and possibly repair the INVESTIGATOR to its pre-charter condition.

2.79     Olympic and HMS has incurred, and continues to incur, substantial administrative costs, personnel costs, attorney's fees, and additional expenses.

### III.  FIRST CAUSE OF ACTION

### BREACH OF CONTRACT

3.1     Plaintiffs hereby incorporate the above-stated allegations.

3.2     Fathom breached the governing Charter in numerous respects, including, but not limited to, the following:

a.     Failing to redeliver the INVESTIGATOR as required by the Charter, including redelivering the INVESTIGATOR to Vancouver, British Columbia, Canada;

b.     Failing to pay all charges and expenses of every kind and nature whatsoever relating to the INVESTIGATOR, its use and/or operation during the Charter Period;

c.     Failing to maintain the INVESTIGATOR in a good state of repair, in efficient operating condition as it was upon delivery and otherwise in accordance with good U.S. commercial maintenance practice;

d.     Failing to pay all costs and expenses relating to the Coast Guard;

e.     Failing to take all reasonably necessary measures to prevent exposure of component parts of the INVESTIGATOR, including its bottom and painting;

f.     Failing to pay all hire due under the terms of the Charter;

COMPLAINT FOR MONEY DAMAGES
AND INJUNCTIVE RELIEF - 14

ATTORNEYS AT LAW
**BAUER MOYNIHAN & JOHNSON LLP**
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON  98121-2320
(206) 443-3400

g.    Failing to indemnify and hold Olympic harmless from those costs and expenses due upon the "failure of insurance;"

e.    Failing to indemnify Olympic against any loss, damage or expense incurred by Olympic arising out of or in relation to the operation of the INVESTIGATOR by Fathom.

3.3    Fathom's breach of the Charter has damaged Olympic and HMS in an amount to be determined at trial, but, at present, not less than $4,600,000.

## IV.  SECOND CAUSE OF ACTION

## ATTORNEYS' FEES AND COSTS

4.1    Plaintiffs hereby incorporate the above-stated allegations.

4.2    The Charter provides that Fathom is to indemnify and hold Olympic harmless (including legal fees and costs of litigation) of and from any loss, damage, expense, liability, claim, or suit resulting from the failure of any of the insurances Fathom was to maintain.

4.3    The Charter provides that Fathom is to indemnify Olympic against any loss, damage or expense incurred by Olympic arising out of or in relation to the operation of the INVESTIGATOR by Fathom.

4.4    The Charter provides further that the substantially prevailing party to any lawsuit related to the Charter is entitled to its attorney's fees and costs.

4.5    Olympic is entitled to said remedies as a party to the Agreement in an amount to be proven at trial.

## V.  THIRD CAUSE OF ACTION

## BREACH OF THE WARRANTY OF WORKMANLIKE PERFORMANCE

5.1    Plaintiffs hereby incorporate the above-stated allegations.

5.2    The warranty of workmanlike performance is implied in every maritime contract.

5.3    Fathom owed Olympic an implied warranty to plaintiffs that it would perform the Charter in a workmanlike manner.

COMPLAINT FOR MONEY DAMAGES
AND INJUNCTIVE RELIEF - 15

5.4     Fathom breached the implied warranty of workmanlike performance by failing to perform the Charter with the degree of care, skill, attention, and diligence necessary.

5.5     Fathom also breached the warranty of workmanlike performance by failing to assign appropriately skilled and/or trained employees to perform the Charter as agreed and safeguard and recover the INVESTIGATOR.

5.6     As a result of Fathom's failure to perform the work in a workmanlike manner, Olympic and HMS sustained damages in an amount to be determined at trial, but not less than $4,600,000.

## VI.  FOURTH CAUSE OF ACTION

### BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

6.1     Plaintiffs hereby incorporate the above-stated allegations.

6.2     The duty of good faith is implied in every maritime contract.

6.3     Fathom owed Olympic a duty of good faith that included, without limitation, a guaranty against arbitrary and unreasonable conduct and a warranty against any action having the effect of destroying or injuring the right of Olympic to receive the full benefits of its Charter with Fathom and the asset contracted for therein.

6.4     Fathom breached its implied duty of good faith by acting arbitrarily and capriciously in safeguarding and failing to redeliver the INVESTIGATOR as required in the Charter.

6.5     As a direct, foreseeable and proximate result of Fathom's breach of the implied warranty of good faith, Olympic and HMS have suffered damages in an amount to be proved at trial, including without limitation costs related to attempts to safeguard and recover the INVESTIGATOR and other consequential loss resulting from Fathom's willful and dilatory refusal to honor its contractual obligations.  The full extent of Olympic and HMS' damages will be proven at trial, but exceed $4,600,000.

COMPLAINT FOR MONEY DAMAGES
AND INJUNCTIVE RELIEF - 16

## VII.  FIFTH CAUSE OF ACTION

## PROMISSORY ESTOPPEL

7.1     Plaintiffs hereby incorporate the above-stated allegations.

7.2     Fathom assured Olympic/HMS on numerous occasions that the recovery of the INVESTIGATOR was imminent, and subsequently discouraged and obstructed Olympic/HMS from becoming meaningfully involved in recovery of the INVESTIGATOR as discussed above.

7.3     The foregoing statements and actions by Fathom constitute promises that Fathom should have reasonably expected to induce definite and substantial forbearance on the part of Olympic/HMS with regard to the recovery effort of the INVESTIGATOR.

7.4     Fathom's promises induced such reasonable forbearance by Olympic/HMS.

7.5     As a direct, foreseeable and proximate cause of the promises made by Fathom, Olympic and HMS have suffered damages in an amount to be proved at trial, but not less than $4,600,000 resulting from Fathom's failure to honor its promises.

## VIII.  SIXTH CAUSE OF ACTION

## UNJUST ENRICHMENT

8.1     Plaintiffs hereby incorporate the above-stated allegations.

8.2     As a result of its failure to perform, as agreed, Fathom has been unjustly enriched at Olympic's expense and is therefore indebted to Olympic for all amounts owing for charter hire, past and future, as well as those costs associated with failure to redeliver the INVESTIGATOR, and costs associated with drydocking and repairing the barge, in an amount to be proven at trial.

## IX.  SEVENTH CAUSE OF ACTION

## NEGLIGENCE

9.1     Plaintiffs hereby incorporate the above-stated allegations.

9.2     Fathom, as operator of the INVESTIGATOR had a duty to operate the barge with reasonable degree of care, as provided for under general maritime law.

9.3     Fathom breached its duty of care when it grounded the INVESTIGATOR in the Canadian Arctic and failed to recover the barge.

9.4     Fathom's breach was the proximate cause of the actual grounding of the barge, the impending perils still facing the barge, as well as the CCG's October 6, 2016 Direction Order, both of which required Olympic to act to attempt to refloat the barge.

9.5     As a proximate cause of Fathom's negligence, Olympic has been damaged in an amount to be proven at trial, but not less than $4,600,000.

9.6     As a proximate cause of Fathom's negligence, its interference with Olympic's recovery of the INVESTIGATOR, and the ongoing grounding of the barge near an Inuvialuit settlement, culturally important Inuvialuit sites, and in a wildlife sanctuary has done irreparable harm to Olympic's reputation for safety and environmental stewardship in an amount to be determined at trial.

## X.  EIGHTH CAUSE OF ACTION

### BAILMENT

10.1     Plaintiffs hereby incorporate the above-stated allegations.

10.2     At the time of the grounding, the INVESTIGATOR was in the sole possession and control of Fathom.

10.3     The INVESTIGATOR had been delivered to Fathom under the terms of the Charter.

10.4     Fathom was obligated to redeliver the INVESTIGATOR in at least the same good order and condition as delivered.

10.5     Fathom failed to redeliver the INVESTIGATOR in good order, and, in fact, redelivered it in a damaged condition.

10.6     Because Fathom breached its duty as bailee, Olympic and HMS were caused to suffer damages in an amount to be determined at trial, but not less than $4,600,000, plus prejudgment interest and costs.

COMPLAINT FOR MONEY DAMAGES
AND INJUNCTIVE RELIEF - 18

# XI.  NINTH CAUSE OF ACTION

## REMOVAL AND REDELIVERY OF THE INVESTIGATOR

## BY WAY OF MANDATORY INJUNCTION

11.1    Plaintiffs hereby incorporate the above-stated allegations.

11.2    Under the governing Charter, Fathom has a duty to redeliver the INVESTIGATOR as required by the Charter, including redelivering the INVESTIGATOR to Vancouver, British Columbia, Canada.

11.3    Stemming from that contractual obligation, Olympic also enjoys certain equitable rights, including the right to have the INVESTIGATOR so redelivered.

11.4    There is a substantial likelihood of success by Olympic on the merits of its lawsuit; to wit, Fathom's grounding of the INVESTIGATOR, failure to redeliver it, failure to pay charter hire, failure to secure adequate insurance, and failure to indemnify and hold Olympic harmless are clear breaches of the Charter.

11.5    Irreparable injury will be suffered if the INVESTIGATOR is not removed from its present position, including potential petroleum discharge into the surrounding environment, sanction by the CCG, and ongoing damage to Olympic's business reputation.

11.6    Harm both to Olympic and the surrounding environment clearly outweigh any burden to Fathom in redelivering the barge—performance Fathom was required to render under the terms of the Charter and per the Direction Orders of the CCG.

11.7    Requiring Fathom to redeliver the barge will plainly serve the public interest by removing a threat to the pristine environment surrounding Toker Point and the Inuvialuit population residing nearby.

11.8    Accordingly, Olympic requests a mandatory injunction issue requiring Fathom to remove the INVESTIGATOR and redeliver it to Vancouver, British Columbia, Canada, per the terms of the governing Charter, as well as perform all of the other obligations which it assumed pursuant to the Charter.

ATTORNEYS AT LAW
**BAUER MOYNIHAN & JOHNSON LLP**
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON  98121-2320
(206) 443-3400

## XII.  PUNITIVE DAMAGES

12.1    Plaintiffs hereby incorporate the above-stated allegations.

12.2    Fathom's ineptness, conceit, obstruction, and otherwise unconscionable behavior includes, but is not limited to the following: holding Olympic's barge hostage; willfully delaying the recovery of that barge; risking a petroleum spill in an Inuvialuit settlement and a wildlife sanctuary; engaging in the foregoing for the purpose of seeking monetary gain from Olympic's own underwriters (to Olympic and HMS' detriment); engaging in the foregoing for the purpose of negotiating a better purchase price for the INVESTIGATOR.

12.3    Fathom's actions constitute reckless, willful, and wanton behavior entitling Olympic and HMS to punitive damages against Fathom.

12.4    Olympic and HMS hereby request $5,000,000 in additional punitive damages against Fathom for its reckless, willful, and wanton conduct.

## PRAYER FOR RELIEF

WHEREFORE, Olympic Tug & Barge, Inc. and Harley Marine Services, Inc. pray:

1.    That the Court award judgment in favor of Olympic and against Fathom on Olympic's causes of action, in an amount to be proven at trial, but not less than $4,600,000;

2.    Punitive damages against Fathom in the amount of $5,000,000;

3.    That the Court award judgment in favor of Olympic against Fathom for all fees and costs, including attorneys' fees, called for under the Charter and allowed by applicable law;

4.    That plaintiff be awarded pre-judgment interest on the unpaid charter hire at the rate called for in the Charter, and otherwise be awarded pre- and post-judgment interest and costs as allowed by law;

5.    That the Court issue a mandatory injunction against Fathom requiring it to remove the INVESTIGATOR and redeliver it to Vancouver, British Columbia, Canada, as well as perform all of the other obligations which it assumed pursuant to the Charter;

6.    For such other and further relief as the Court deems just and proper.

ATTORNEYS AT LAW
**BAUER MOYNIHAN & JOHNSON LLP**
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON  98121-2320
(206) 443-3400

DATED this Friday, June 02, 2017.

BAUER MOYNIHAN & JOHNSON LLP

s/Tom Waller
Thomas G. Waller, WSBA No. 22963
s/Mark Krisher
Mark A. Krisher, WSBA No. 39314
s/Robert Sykes
Robert D. Sykes, WSBA No. 49635
Attorneys for plaintiffs Olympic Tug & Barge, Inc.
and Harley Marine Services, Inc.
Bauer Moynihan & Johnson LLP
2101 Fourth Avenue, Suite 2400
Seattle, WA  98121
Telephone:  (206) 443-3400
Fax:  (206) 448-9076
E-mail: tgwaller@bmjlaw.com
E-mail: makrisher@bmjlaw.com
E-mail: rsykes@bmjlaw.com

COMPLAINT FOR MONEY DAMAGES
AND INJUNCTIVE RELIEF - 21